UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SHEILAH MARAMARK,

    Plaintiff,

    v.

MARGARET SPELLINGS, Secretary,
United States Department of Education,

    Defendant.

Civil Action No. 01-2206 (CKK)

**MEMORANDUM OPINION**
(February 3, 2006)

Plaintiff, a former excepted service term employee of the United States Department of

Education, brings the above-captioned action against Defendant Margaret Spellings[1] in her official

capacity as Secretary of the Department of Education pursuant to Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e, *et seq.*, as amended ("Title VII"), alleging, *inter alia*, that she was

subjected to discrimination based on her race – African-American – and in retaliation for her prior

use of the Equal Employment Opportunity ("EEO") process.  *See* Compl. ¶¶ 28-36 (Count I –

Racial Discrimination), ¶¶ 37-38 (Count II – Retaliation).  Following the Court's February 17,

2004 Memorandum Opinion granting Defendant's Motion to Dismiss and denying Defendant's pre-

discovery Motion for Summary Judgment, Plaintiff's sole remaining claim revolves around an

---

[1] Roderick R. Paige, former Secretary of the United States Department of Education, was originally the named Defendant in this suit.  *See* Compl. at 1.  Following her confirmation by the United States Senate, Margaret Spellings became Secretary of the United States Department of Education on January 20, 2005.  Rule 25(d) of the Federal Rules of Civil Procedure provides, in relevant part, "When a public officer is a party to an action in his official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and the officer's successor is automatically substituted as a party."  Accordingly, pursuant to Rule 25(d), the Court shall substitute Margaret Spellings for Roderick Paige as the Defendant in this case.

allegation that she was subjected to discrimination and retaliation when she was denied a detail

which purportedly would have prepared her for a permanent position with the National Library of

Education ("NLE").  *See Maramark v. Paige*, Civ. No. 01-2206, at 6 & n.6, 9, 10 & n.9, 11 & n.

11 (D.D.C. Feb. 17, 2004) (memorandum opinion and order dismissing all claims other than

Plaintiff's allegations surrounding the denial of a detail to the NLE).

　　Following extended discovery in this case around Plaintiff's remaining claim, Defendant

filed a second Motion for Summary Judgment, followed by Plaintiff's Opposition, Defendant's

Reply, and Plaintiff's Surreply.  Upon a searching consideration of the filings currently before the

Court, the attached exhibits, the relevant case law, and the entire record herein, the Court shall grant

Defendant's Motion for Summary Judgment.

## I: BACKGROUND

A.　　*Plaintiff's Appointment to the Department of Education*

　　Plaintiff, Dr. Sheilah Maramark, a Ph.D. in Psychology, was hired by the Department of

Education on August 26, 1991 as an excepted service term employee in the Office of Educational

Research and Improvement ("OERI") as an OERI Associate.  *See* Def.'s Mot. for Summ. J., Ex. 1

(Notification of Personnel Action with effective date of 8/26/91).[2]  As an "excepted service term

---

[2] The Court begins its discussion of the facts by noting that this Court strictly adheres to the text of Local Civil Rule 56.1 (identical to Local Civil Rule 7.1(h)).  As such, in resolving the present summary judgment motions, this Court "assumes that facts identified by the moving party in the statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."  LCvR 56.1.  The Court also cites directly to the record, where appropriate, to provide additional information not covered in either of the parties' statements.

　　Contrary to Local Civil Rule 56.1, Plaintiff, in responding to Defendants' Statement of Material Facts Not in Dispute, has not provided "a separate *concise* statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated."  LCvR 56.1 (emphasis added).  Rather than admitting, denying, or denying-in-part/ admitting-in-part each statement set out by Defendant in corresponding numbered paragraphs and

supporting each response through citations to the record, as required by Local Civil Rule 56.1 and this Court's January 1, 2005 Minute Order, Plaintiff (1) sets out only her list of "Disputed Material Facts," but in no way responds to the factual allegations set out in specific paragraphs by Defendant in its Statement of Material Facts as to Which There is No Genuine Dispute, and (2) peppers this filing with argument, speculation, conjecture, and assumptions that – while proper in her accompanying Opposition – are not proper in the context of Plaintiff's Response to Defendant's Statement.

Plaintiff's Opposition itself is also quite unhelpful, as Plaintiff frequently makes assertions but then fails to include any citation to the factual record despite specifically leaving spaces and large gaps for such a citation. *See, e.g.*, Pl.'s Opp'n at 16 n.7 ("Plaintiff presents more facts revealing the concrete adversity resulting from the denial of that detail to NLE, *infra*, pp. ."), at 22 ("The failure to be selected was also another opportunity to obtain permanent employment that was denied to Plaintiff Maramark. The behavior ___"), at 28 n.17 ("Ms. Bither was able to retire from OERI in 2000. Exh.,__"), at 33 n.19 ("This material fact is contested. Plaintiff's Material Facts in Dispute No. ."), at 38 ("Her total time in excepted service positions was 8 years. Exh., OERI Excepted Service Employees, listing her start date in 1992, and Exh. , OERINews with notice of her retirement in 2000."). Indeed, Plaintiff's argument is peppered with this problem, where Plaintiff makes a factual assertion and then either fails to cite to the record or the citation does not support the contention made.

The Court finds that Plaintiff's deviation from the mandate of the Local Civil Rule undermines the purpose of the Rule which is to assist the Court in quickly determining which facts are actually in dispute. *See Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 153 (D.C. Cir. 1996) ("[R]epeatedly blending factual assertions with legal argument, the 'relevant facts' section does not satisfy the purposes of a [Rule 56.1] statement."); *Robertson v. American Airlines*, 239 F. Supp. 2d 5 (D.D.C. 2002) (striking defendant's motion for summary judgment for noncompliance with Local Rule 7 and 56.1 because the "statement of material facts not in genuine dispute" included no citations to the record and improperly mixed factual allegations with argument); *Gibson v. Office of the Architect of the Capitol*, Civ. No. 00-2424(CKK), 2002 WL 32713321, at *1 n.1 (D.D.C. Nov. 19, 2002) ("Plaintiff's Statement is almost completely unhelpful to the Court as its provisions rarely address the facts outlined in Defendant's Statement, instead describing in lengthy detail the 'contextual and structural background' surrounding Defendant's stated facts. Such excess, unresponsive verbiage is a clear violation of both the letter and the spirit of Local Rule 56.1."); *see also Koken v. Auburn Mfg., Inc.*, Civ. No. 02-83B-C, 2004 WL 1877808, at *2 (D. Me. Aug. 24, 2004) (chastising plaintiff for responding to defendant's statement of material facts by failing to cite to the record and for using cross-references that in most cases referred to other additional statements in response to defendant's singular statement, stating "[p]resumably [plaintiff] found this technique expeditious. I, however, did not."); *Leanard v. Inhabitants of the Town of Van Buren*, 182 F. Supp. 2d 115 (D. Me. 2002) (deeming defendants' facts admitted in part because "many of Plaintiff's statements do not actually controvert the Defendants' fact that they purport to address").

While the purpose of Rule 56.1 was to "place the burden on the parties and their counsel, who are most familiar with the litigation and the record, to crystalize for the district court the material facts and relevant portions of the record," *Finnegan*, 101 F.3d at 151, the Court shall

employee," Plaintiff was hired pursuant to the statutes allowing the Department of Education to "appoint, for terms not to exceed three years . . . such scientific or professional employees" considered necessary to carry out the OERI's functions. *Id.*, Ex. 2 (Higher Education Amendments of 1986, Pub. L. No. 99-498, § 1401, 100 Stat. 1268 (1986); Goals 2000: Educate America Act, Pub. L. No. 103-227, § 912(c), 108 Stat. 124 (1994)). The applicable statutory provisions allow the Department of Education to reappoint limited term employees – such as Plaintiff – "for one additional term not to exceed three years" upon "presentation of a clear and convincing justification of need . . . ." *See* Pub. L. No. 99-498, § 1401(d)(2)(A) ("The Secretary may appoint, for terms not to exceed three years (without regard to the provisions of title 5, United States Code, governing appointment in the competitive service) . . . such scientific or professional employees of the Office as the Secretary considers necessary to accomplish its functions.") & (B) ("The Secretary may reappoint employees described in subparagraph (A) upon presentation of a clear and convincing justification of need, for one additional term not to exceed three years. All such employees shall work on activities of the Office and shall not be reassigned to other duties outside the Office during their term."); Pub. L. No. 103-227, § 912(c)(2) (same). Pursuant to this latter provision, Plaintiff – in 1994 – received an additional three-year term appointment which expired on August 26, 1997.

In addition to the statutory limitations placed on Plaintiff's position with the Department of Education, Plaintiff's position as an "excepted service term employee" was also covered by an agreement between the Department of Education and the American Federation of Government Employees. *See, e.g.*, Def.'s Mot. for Summ. J., Ex. 3 (June 17, 1982 Directive re: Excepted

---

accept the additional burden placed on it by Plaintiff and shall not – in this instance – strike Plaintiff's Response to Defendants' Statement or accept all of Defendants' facts as undisputed. Rather, the Court shall carefully parse the record and both sets of "Material Facts Not in Dispute" when outlining the background of this dispute and cite to the record whenever possible.

Appointing Authority/Non-Bargaining Unit Employees); Pl.'s Opp'n, Ex. 8 (Feb. 23, 1986

Directive re: Excepted Appointing Authority/Non-Bargaining Unit Employees).  As outlined in the

relevant union agreements, "[t]he impermanent nature of most of the excepted appointments reflects

two considerations."  *Id.*, Ex. 3 (June 17, 1982 Directive) at OERI:12-1.  First, "[i]t is a means of

staying in touch with the frontiers of private research," because (1) rapid turnover is necessary to the

stimulation of new research, experimental ideas, and fresh direction, and (2) "[i]ndividual[s] who

have made contributions within the NIE [National Institute of Education] should return to the

private sector to implement them."  *Id.*  Second, the "NIE is designed to act only as an initiator of

education research with permanent funding for worthy projects coming from other sources."  *Id.* at

OERI:12-2.  In general, the union does not support the hiring of excepted employees unless work

requirements and timeliness dictate that career employees cannot do the work.  *See id.*, Ex. 5

(8/9/94 e-mail from Robert Morgan to Jacquelyn Zimmerman) at 1.  The union's position is

consistent with the 1994 statute ("Goals 2000: Educate America Act") re-authorizing the OERI to

hire term employees for up to six years but only when the OERI could not otherwise obtain scientific

or technical expertise through the competitive service.  *See id.*, Ex. 2 (Pub. L. No. 103-227, §

912(c)(1)(C)).  The union, however, had no objection to excepted service employees competing for

and obtaining permanent, career positions by competition.  *See id.*, Ex. 5 (8/9/94 e-mail from Robert

Morgan to Jacquelyn Zimmerman).  Plaintiff, as an excepted service term employee, was not a

member of the bargaining unit.  *See* Pl.'s Disputed Mat. Facts ¶ 4; Def.'s Resp. ¶ 4 (noting that such

a claim, while irrelevant, "is not disputed").

      B.     *Plaintiff's First Term With the OERI and First EEO Complaint*

      From the onset of her career with the OERI, Plaintiff received largely positive performance

evaluations and praise for her work.  *See* Pl.'s Opp'n, Ex. 4 (Plaintiff's Letters of Recommendation

and Praise).  However, on February 21, 1995, Plaintiff brought an EEO complaint based on certain

actions taken by Dr. Joseph Conaty, her second-level supervisor at the time and a Caucasian male.

*See* Def.'s Mot. for Summ. J., Ex. 6 (Feb. 23, 1995 Letter from Steven Silverberg, Esq., Plaintiff's

representative, to Assistant Secretary of Education Dr. Sharon P. Robinson).  Specifically, Plaintiff's

EEO complaint focused on Dr. Conaty's failure to approve Plaintiff's request for a promotion, a

negative performance evaluation for the 1993-1994 time period that was approved by Dr. Conaty,

disputes over Plaintiff's title, and a request to have her salary increased.  *Id*.  Plaintiff contended that

race-based discrimination was at the heart of her disparate treatment vis-á-vis her white colleagues,

and concluded with a request that her employment with the OERI be converted from excepted

service status to career status.  *Id*. at 3.

Charles Hansen, former Deputy Assistant Secretary of the OERI, participated in the

resolution of Plaintiff's EEO complaint on behalf of the Department of Education.  *See* Def.'s Mot.

for Summ. J., Ex. 9 (2/24/05 Hansen Dep.) at 13:8-11, 14:18-15:7.  Upon an investigation, Hansen

concluded that there was insufficient evidence indicating a lack of performance by Plaintiff.  *Id*.

Accordingly, he supported and effectuated a settlement with Plaintiff on September 20, 1995 that

included:  (1) a 10% pay raise; (2) a title change to OERI Senior Research Associate (a position

comparable to a GS-14 or GS-15); (3) approximately nine months of back pay; (4) a reassignment

of Plaintiff away from her previous first and second-level supervisors; (5) a voiding of the negative

performance appraisal; and (6) attorney's fees.  *Id*.; *see also* Def.'s Mot. for Summ. J., Ex. 8 (Sept.

20, 1995 Memorandum of Agreement) at 1-3; *id*., Ex. 10 (8/27/98 Hansen Test. in *Maramark v.*

*Riley*, Compl. No. ED-9747000) at 56:8-10.

C.      *Plaintiff's Second Term and Second EEO Complaint*

1.      The Impact of the Court's February 17, 2004 Memorandum Opinion

Prior to the expiration of Plaintiff's appointment with the Department of Education on

August 26, 1997, Plaintiff filed a second EEO complaint on August 15, 1997.  Plaintiff's 1997

EEO complaint included the following exhausted claims:

> Allegation Number 1:  whether the Complainant was discriminated against based on
> race and reprisal when management allowed her appointment under the Excepted
> Appointment Authority to expire on August 26, 1997.

> Allegation Number 2:  whether the Complainant was discriminated against based on
> race and reprisal on March 25, 1997, when management did not re-assign her to the
> National Library of Education.

Pl.'s Mot. for Summ. J., Ex. 10 (8/27/98 Fact-Finding Conference Before Investigator Liston A.

Jackson in *Maramark v. Riley*, Compl. No. ED-9747000) at 3:18-4:4.

This Court, in its February 17, 2004 Memorandum Opinion and Order granting Defendant's

Motion to Dismiss and denying Defendant's pre-discovery Motion for Summary Judgment, dealt

with these and other claims arising out of Plaintiff's second three-year term with the OERI in a

manner that impacts the facts relevant to the resolution of Defendant's current Motion for Summary

Judgment.[3]  Specifically, the Court granted summary judgment to Defendant on "Allegation

Number 1," finding that the expiration of Plaintiff's appointment did not constitute an adverse

action.  *See Maramark v. Paige*, Civ. No. 01-2206, at 9 (D.D.C. Feb. 17, 2004) (memorandum

opinion and order dismissing all claims other than Plaintiff's allegations surrounding the denial of a

_____

[3] Because the Defendant submitted matters outside of the pleadings and Plaintiff responded
likewise, the Court – pursuant to Federal Rule of Civil Procedure 12 – converted the motion for a
Rule 56 motion and made its rulings in the summary judgment context.  *Maramark v. Paige*, Civ.
No. 01-2206, at 9 (D.D.C. Feb. 17, 2004) (memorandum opinion and order dismissing all claims
other than Plaintiff's allegations surrounding the denial of a detail to the NLE)

detail to the NLE).  The Court emphasized:

> It is undisputed that Plaintiff was appointed to a position that permitted a maximum of two three-year terms of employment.  She served her first term, was appointed to a second, and served that term as well.  Plaintiff does not dispute the nature of her position, the statutory and regulatory basis for its duration, nor does she contend that the date of its expiration was improper.  Accordingly, there is nothing in the expiration of Plaintiff's appointment making it an adverse action.

*Id.*  The Court also dismissed all of Plaintiff's claims regarding actions taken in 1995 and 1996, given (1) Plaintiff's failure to exhaust administrative remedies and (2) Plaintiff's decision to withdraw these claims from her action.  *Id.* at 5-6.  The dismissed claims included, *inter alia*: (1) Plaintiff's allegation in her Complaint that, in February 1995, she was interviewed for a career position, was told during the interview that she would be hired, but ultimately the position was given to a Caucasian employee whom Plaintiff had to train and assist, Compl. ¶ 31; (2) Plaintiff's assertion in her Complaint that, in May 1995, another excepted service employee who was Caucasian was pre-selected for a career service position, even though Plaintiff was objectively better qualified, *id.* ¶ 32; (3) Plaintiff's contention in her Complaint that she was discriminated against in June 1995 when she was notified of a vacancy that was subsequently cancelled, *id.* ¶ 16; and (4) Plaintiff's claim, made during the administrative stage of this case, that she was discriminated against in October 1996 when she was not placed in a career position, *see* Def.'s Mot. to Dismiss, Ex. 1 (May 20, 1998, EEO letter to Plaintiff's attorney) at 1.  *See Maramark v. Paige*, Civ. No. 01-2206, at 5 n.3 (D.D.C. Feb. 17, 2004) (memorandum opinion and order dismissing all claims other than Plaintiff's allegations surrounding the denial of a detail to the NLE).

Moreover, the Court's ruling (1) dismissed Plaintiff's "pattern and practice" allegations from the Complaint as conceded by Plaintiff, who failed to respond to Defendant's argument on the topic, *id.* at 6 n.6; (2) found that Plaintiff failed to support her allegation that "the Agency posted

8

vacancies for unreasonably short periods of time to preclude [Plaintiff] from applying," *id*. at 10

(quoting Pl.'s Opp'n to Def.'s Mot. to Dismiss at 23), and therefore granted summary judgment in

Defendant's favor on that point; (3) barred a further consideration of Plaintiff's allegation that Ms.

Eve Bither was permitted to maintain her appointment beyond the maximum six-year period, and

then "rolled over" into a career service position, as Plaintiff had provided no citations in the record

to support this allegation and did not refer to Bither in her Statement of Facts, *id*. at 11 n.11

(quoting Pl.'s Opp'n to Def.'s Mot. to Dismiss at 24)[4]; and (4) barred a further consideration of the

"secretive circumstances" surrounding the position taken by Dr. Harold Himmelfarb in May 1995

given Plaintiff's failure to exhaust her administrative remedies, *id*. at 10 n.9 (quoting Pl.'s Stmt. ¶¶

17-19, 22, and noting "Plaintiff has already acknowledged that this incident is barred from this

Complaint due to her failure to exhaust remedies").

     Plaintiff, in her current Opposition to Plaintiff's Motion for Summary Judgment, attempts to

---

    [4] Specifically, the Court's February 17, 2004 Memorandum Opinion ruled that "[t]his reasoning also bars the Court's consideration of Plaintiff's allegation regarding [Ms.] Bither." *See Maramark v. Paige*, Civ. No. 01-2206, at 11 (D.D.C. Feb. 17, 2004) (memorandum opinion and order dismissing all claims other than Plaintiff's allegations surrounding the denial of a detail to the NLE). The Court further found that:

> Plaintiff alleges that [Ms.] Bither, a Caucasian excepted employee, was permitted to maintain [her] appointment beyond the maximum six-year period, and then was "rolled over" into a career service position. Plaintiff provides no citations to [the] record to support this allegation, and does not refer to [Ms.] Bither in her Statement of Facts.

> The Court also notes that while Plaintiff has requested discovery pursuant to Rule 56(f), she does not cite the need to obtain information related to these "adverse actions" (i.e., the Bither incident or the short posting periods) in support of the request. *See Strang v. U.S. Arms Control & Disarmament Agency*, 864 F.2d 859, 861 (D.C. Cir. 1989). Accordingly, the Court shall deny Plaintiff's Rule 56(f) request.

*Id*. at 11 n.11.

resurrect the events surrounding these dismissed claims in the guise of providing "background" to her remaining claim. *See, e.g.*, Pl.'s Opp'n at 7-11; Pl.'s Disputed Mat. Facts ¶ 8; *see also Maramark v. Paige*, Civ. No. 01-2206, at 6 n.5 (D.D.C. Feb. 17, 2004) (memorandum opinion and order dismissing all claims other than Plaintiff's allegations surrounding the denial of a detail to the NLE) ("Plaintiff states that she reserves the right to use these allegations as background evidence to support her timely claims. Pl.'s Opp'n at 14. The Court does not comment at this time whether Plaintiff's assertion is correct under the law."). While it is certainly true that a Title VII plaintiff may use prior acts as background evidence in support of a timely claim, *see Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2022), the Court notes that much of this information is not particularly relevant given the current posture of this case. Where relevant, the Court shall discuss such facts in the context of Plaintiff's sole remaining claim.[5]

_____

[5] In many ways, Plaintiff has used this opportunity to attempt to circumvent the Court's previous ruling and reargue claims no longer in this suit. For instance, Plaintiff has made an argument regarding vacancies listed in 1996 and an "open season" during that same time period; this argument is hinted at in her Opposition and expounded upon in her Surreply. Essentially, Plaintiff's argument is two-fold. First, although this argument is quite unclear in her Opposition, Plaintiff contends that the Department of Education had an "open season" in December 1996 involving some twenty-nine vacancies; however, because she was an excepted service term employee, she and her fellow excepted employees were allegedly denied an opportunity to apply for one of these vacancies. *See, e.g.*, Pl.'s Opp'n at 23 n.13. Second, Plaintiff argues that when other vacancies appeared outside of this open season, she did not apply to them because the Department of Education somehow "lulled Plaintiff into not pursuing" these opportunities because of a promise of a detail. *See* Pl.'s Surreply at 1-2.

Three points are in order. First, the Court definitively dismissed these claims regarding actions taken in 1995 and 1996 and the posting of vacancies in its prior Memorandum Opinion, as Plaintiff (1) had failed to exhaust her administrative remedies for these claims, (2) had conceded these claims and withdrawn them from this case, and (3) had failed to provide support for these claims in the face of Defendant's motion and evidence. *See Maramark v. Paige*, Civ. No. 01-2206, at 5-6, 10 (D.D.C. Feb. 17, 2004) (memorandum opinion and order dismissing all claims other than Plaintiff's allegations surrounding the denial of a detail to the NLE). Plaintiff cannot now reargue these claims and whitewash the noted problems by ignoring them. The Court made it clear in its prior ruling: Plaintiff has one claim left, and it revolves around her non-detail. *Id.* at 8-9. Second, even confronting the substance of these allegations, it is evident that the record does not support

As previously implied, the Court's February 17, 2004 Memorandum Opinion and Order denied Defendant's pre-discovery motion for summary judgment as to one of Plaintiff's claims: her original "Allegation Number Two," i.e., an allegation that Plaintiff was subjected to discrimination and retaliation when she was denied a detail which purportedly would have prepared her for a permanent position with the NLE. *See Maramark v. Paige*, Civ. No. 01-2206, at 8-9 (D.D.C. Feb. 17, 2004) (memorandum opinion and order dismissing all claims other than Plaintiff's allegations surrounding the denial of a detail to the NLE). In denying Defendant's motion for summary judgment on this point, the Court emphasized the lack of development in the factual record and its reliance on Plaintiff's attached affidavit stating that receiving the detail assignment with the NLE would have provided her with the skills that would have prepared her for full-time employment at the NLE. *Id.* at 8 (quoting Pl.'s Opp'n, Ex. 1 (Pl.'s Decl.) ¶ 4) ("The Director of NLE, Mr. Blane Dessey, informed me and reassured me that this detail would provide me with specialized skills that

---

Plaintiff's arguments. For example, Sharon Robinson, in announcing the "open season" focused on by Plaintiff, specifically noted: "It should also be stressed that this open season only provides for lateral reassignments. Therefore this process is not designed to create promotion potential." *See* Pl.'s Opp'n, Ex. 16 (12/20/96 Open Season Announcement). Accordingly, even if all excepted service term employees like Plaintiff were actually barred from participating in this process, which is unclear based on the present record, such participation would not have affected Plaintiff's chances for a promotion to permanent status. Third, Plaintiff's argument that the Department of Education stymied her progress towards career employment by "lulling" her with the promise of a detail is wholly without foundation. Plaintiff does not deny that she had notice of other opportunities within the Department of Education, but attempts to pin all of the blame for her failing to take action on the agency itself – a finding not supported by the record. Importantly, Dessey consistently told Plaintiff that a detail was "the best" he could do, and that he was not promising permanent employment. Moreover, Plaintiff was also clearly aware of the hiring freeze, and the limited overall opportunities, but took no protective action. Finally, Plaintiff was well aware that fellow excepted service employees who actually obtained permanent employment, such as Harold Himmelfarb, were only successful after applying to multiple "all source" positions numerous times. *See, e.g.*, Def.'s Mot. for Summ. J., Ex. 17 (records showing that Himmelfarb applied to approximately seven "all source" positions before obtaining permanent employment). Given that Plaintiff knew her excepted service term was expiring, putting all of her proverbial eggs in one basket – a detail that did not promise permanent status – was her choice and her error alone.

would make me an asset to the NLE and prepare [me] for jobs in the NLE that be permanent career

positions at the GS-14 level.  In fact, Dessey was very well aware of my excepted service status

which is why he told me that at this point being detailed to the Library and becoming specialized in

that area would be the best way to obtain a permanent career service position.").  Given that

discovery on this issue has now been completed, the Court shall review the factual record adduced

by the parties in order to determine whether the presumption behind Plaintiff's pre-discovery

affidavit – i.e., the existence of full-time employment and the denial of a tangible employment

opportunity – was accurate or supportable.

2.    <u>The Denial of a Detail With the NLE</u>

According to Plaintiff's friend and cohort at the OERI, Barbara Humes, by 1996, Blane

Dessy, head of the NLE, "was looking for good staff to help make a real effort at having an excellent

National Library."  Pl.'s Opp'n, Ex. 5 (Humes Decl.) ¶ 5.  Because she had a degree in Library

Science and had worked for Dessy previously, Dessy recruited Humes.  *Id*. ¶ 5.  Humes then told

Dessy about Plaintiff, whom she considered to be "very bright and an excellent worker."  *Id*. ¶ 8.

According to Humes, "[w]e discussed Dr. Maramark's interest in a permanent position and he told

me that he wanted to talk with her about coming to work in NLE.  Then I introduced them.  Mr.

Dessy thought that the best way for both of us to get permanent positions in NLE was for us to come

over to the Library on a detail."  *Id*. ¶¶ 8-9.  After being informed of this opportunity by Humes,

Plaintiff then approached Dessy about a position with the NLE in January 1996.  Def.'s Mot. for

Summ. J., Ex. 11 (12/28/04 Maramark Dep.) at 57:4-23.

From the start, Plaintiff's objective was a permanent career position with the NLE.  *Id*. at

61:3-7.  However, Dessy offered Plaintiff only a detail with the NLE.  According to Plaintiff, "I

approached Mr. Dessy about a career service position, a permanent position.  I told him that I

12

understood that he was understaffed.  I told him that my status and my term were going to be up in a

certain amount of time and asked him if he could use someone with my skills."  *Id.* at 58:1-5.

Plaintiff could not recall whether there were any specific open positions at the NLE during this time,

or whether any vacancy announcements in the NLE were posted between January 1996 and August

1997, and did not know whether Dessy could convert her term appointment into a permanent

position.  *Id.* at 59:17-60:8, 62:25-63:22.  Indeed, Dessy did not explain to Plaintiff that she could

pursue a permanent position with the NLE via a term appointment.  *Id.* at 62:2-6.  While Dessy was

excited by Plaintiff's interest and skills, *id.* at 58:6-20, "the best he was able to offer at that point in

time" was a detail to the NLE, *id.* at 61:6-20.  *See also* Def.'s Mot. for Summ. J., Ex. 15 (7/13/98

Resp. to Pl.'s Interrogs. by Dessy) at 1 ("At no time was Complainant formally offered a position in

the National Library nor was any guarantee made that a position could be created for the

Complainant.").

Accordingly, on February 15, 1996, Dessy sent Plaintiff and Humes an email stating, in

relevant part:

> I have finally gotten a chance to speak with Chuck [Charles Hansen] about the
> possibility of details to the National Library.  He said that if the current supervisor
> agrees, then it's OK.  I know that this is not the same as a reassignment, but until all
> of that paperwork is resolved, a detail is the only way to move this along.  I would
> hope that once the reorganization is complete, we could finalize your assignments to
> the Library.
>
> Are you interested in a detail to the Library?  If yes, I need to speak with David
> Boesel.
>
> Please let me know.  I would be happy to welcome you both to the Library.

Def.'s Mot. for Summ. J., Ex. 13 (2/15/96 E-mail from Dessy to Plaintiff and Humes).  After

receiving this e-mail, Humes decided to stay where she was within the Department of Education,

while Plaintiff remained interested in the position.  *See* Pl.'s Opp'n, Ex. 5 (Humes Decl.) ¶ 10.  Dr.

David Boesel, who was Plaintiff's immediate supervisor at the time, did agree to the detail and later began discussions with Plaintiff on what projects she would pursue while detailed.  *See* Pl.'s Opp'n, Ex. 11 (4/19/96 E-mail from Plaintiff to Boesel and Dessy).  Indeed, Plaintiff's detail appeared imminent, as in April 1996, Inez Frazier, who worked in an administrative support position in Dessy's office, was asked by Dessy "to do paperwork to detail Sheilah Maramark to NLE."  Pl.'s Opp'n, Ex. 11 (4/26/96 E-mail from Inez Frazier to Delores Monroe re: "Detail of Employee").  Apparently within the material provided to Frazier were sections of the Memorandum of Agreement relating the settlement of her prior EEO complaint, s*ee* Pl.'s Opp'n, Ex. 14 (Pl.'s Decl.) ¶¶ 59-60, and Plaintiff claims that – while she was never advised that the detail would not go forward – after this point, there was a perceptible change in the attitude of Dessy toward her, as their interactions went from cordial to "avoidant."  *See id.* ¶¶ 39, 41-42.  However, the only direct evidence in the record indicates that Mr. Dessy never discovered that Plaintiff had filed a previous EEO complaint.  *See* Def.'s Mot. for Summ. J., Ex. 10 (8/27/98 Dessy Test. in *Maramark v. Riley*, Compl. No. ED-9747000) at 78:3-6, 79:21-80:1; *see also id.*, Ex. 15 (7/13/98 Resp. to Pl.'s Interrogs. by Dessy) at 2 (noting that "I did not know the Complainant was involved in a previous EEO activity").

However, Plaintiff's planned detail to the NLE was not effectuated.  The record shows that throughout March 1996, Plaintiff exchanged emails with Dessy and met with him, but was aware that she could not immediately commence her detail because of work left on her previous assignments with the OERI.  As Plaintiff wrote Dessy on March 8, 1996, "It's not a question of whether or not I'm still interested, but when I'm expected to be there.  I sense some urgency on your part.  This raises my anxiety a bit because I had mentioned earlier about some loose ends that were going to take several weeks to close."  Pl.'s Opp'n, Ex. 11 (3/8/96 E-mail from Plaintiff to Dessy); *see also id.* (3/27/96 E-mail Exchange between Plaintiff and Dessy) (setting up a meeting).  Plaintiff

14

was apparently given three projects after January 1996 that necessitated a longer stay with the

OERI, two of which had immediate priority because they came from Assistant Secretary of

Education Robinson's office. *See id.* (4/19/96 E-mail from Plaintiff to Boesel and Dessy) (Plaintiff

describes her remaining assignments and requests that Boesel "talk to Blane [Dessy] about

renegotiating additional time for [her] to work on Sharon's [Robinson] projects"). By late

August/early September 1996, Plaintiff had completed these additional projects at the OERI and e-

mailed Hansen regarding the status of her detail to the NLE. *See* Def.'s Mot. for Summ. J., Ex. 14

(9/4/96 E-mail from Plaintiff to Hansen); *see also* Pl.'s Opp'n, Ex. 11 (8/27/06 E-mail from

Plaintiff to Hansen) (virtually identical e-mail message). In pertinent part, Plaintiff's September 4,

1996 e-mail states:

> This past April, I worked out an agreement with Blane Dessy to take a detail at NLE
> . . . . I was negotiating a start date with Blane and Dave Boesel when I was asked by
> Sharon Robinson to work on a special project. Because the project was time
> sensitive, I made a promise to Sharon to postpone the detail to give the project my
> full attention and committment [sic].
>
> Now that the project has been completed, I would like to resume discussions on a
> start date to NLE. I am looking forward to making a contribution. Can I anticipate
> a detail to NLE within the next few weeks?

*Id*. Despite receiving this e-mail, Hansen did not respond to this e-mail and apparently took no

further action regarding Plaintiff's detail to the NLE. Accordingly, Plaintiff was never detailed to

the NLE, and her excepted service term expired on August 26, 1997.

3.   Could Plaintiff Have Obtained a Career Position With the NLE Through a
      Detail?

Plaintiff "believed that one of the most promising paths to conversion to career status was

through a detail to the National Library of Education, where research was to be the primary goal of

the position"; as such, "Plaintiff [did] not actively pursu[e] other opportunities at the U.S.

Department of Education," "her efforts to look elsewhere were minimal," and Plaintiff applied for

no "all sources" vacancies during her remaining time at the OERI.  Pl.'s Surreply at 1-2; Pl.'s

Opp'n, Ex. 11 (10/11/01 E-mail from Thomas Johnston to Karen Mayo-Tall) (indicating that there

is "no record of Sheilah Maramark [] having applied for vacancies or making the BQ certs").  This

begs the question, given that it was her only pursued avenue to permanent employment with the

Department of Education:  Could Plaintiff, as an excepted service term employee with the

Department of Education, have obtained a career position with the NLE through a detail that was

converted into permanent employment?

        a.      *Roadblocks Within the Department of Education Preventing*
                *Excepted Service Term Employees From Becoming Permanent*
                *Employees*

A review of the record indicates that certain immovable roadblocks existed in the path of

excepted service term employees such as Plaintiff to a permanent, career position with the

Department of Education.  First, due to severe budget constraints, on July 17, 1995, the Department

of Education announced "a strict hiring freeze effective immediately."  Def.'s Mot. for Summ. J.,

Ex. 16 (Hiring Freeze Announcement).  In the hiring freeze memorandum, Madeline Kunin, Deputy

Secretary, issued two directives that directly impacted individuals in Plaintiff's position:  (1)

"employees with excepted service appointments . . . may not be converted to permanent

appointments," as these employees were to be considered "temporary" and "external" "for the

purposes of the hiring freeze"; and (2) "temporary appointments may not be extended beyond the

date the current appointment expires or September 30, 1995, whichever is later, and temporary

employees may not be converted to permanent appointments."  *Id.* at 1.  This announcement did

leave open the possibility of "a limited number of outside hires," but noted that "requests for such

actions should be prepared only in exceptional circumstances and submitted to the Executive

Management Committee who will review them on a case-by-case basis." *Id.* at 2; *see also* Def.'s Mot. for Summ. J., Ex. 9 (2/24/05 Hansen Dep.) at 90:21-24 (noting that after this, "the opportunities for hiring were very, very limited").[6]

Second, even notwithstanding the hiring freeze announcement, the general rule within the Department of Education was that excepted service term employees could not be converted into "permanent employees"; rather, they faced a maximum of two three-year terms with the agency. *See, e.g.*, Def.'s Mot. for Summ. J., Ex. 2 (Higher Education Amendments of 1986, Pub. L. No. 99-498, § 1401, 100 Stat. 1268 (1986); Goals 2000: Educate America Act, Pub. L. No. 103-227, § 912(c), 108 Stat. 124 (1994)); *id.*, Ex. 3 (June 17, 1982 Directive) at OERI:12-1; *id.*, Ex. 9 (2/24/05 Hansen Dep.) at 33:12-21; Def.'s Reply, Ex. 19 (Hansen Decl.) ¶ 4 ("During my employment with OERI, I was not aware of any excepted service term employee receiving an extension of their limited appointment through the means described by Dr. Maramark – i.e., detailed into a position to be later advertised and targeted expressly for the detailee."); Pl.'s Opp'n, Ex. 11 (7/17/97 E-mail from Eugene Bell to Hansen) (referencing "a copy of a January 10, 1995, memo from Office of General Counsel (OGC) to Tom Hill that addresses the question of having excepted service employees serve more than two terms" and noting that "OGC advises against allowing employees to serve more than two terms" as "there is no suggestion in the legislative history that Congress intended 'to allow excepted service scientific and technical employees in OERI to serve more than two terms'"). Indeed, after Plaintiff brought an informal complaint regarding the denial

---

[6] Plaintiff, in her "Listed of Disputed Material Facts," notes: "Although Plaintiff Maramark does not dispute that a hiring freeze was in effect, she asserts that it was not in effect during a time period relevant to the detail she was promised by not given." Pl.'s Disputed Mat. Facts ¶ 15 (citing Pl.'s Opp'n at 27-28). A review of those pages shows that Plaintiff has no factual support for this allegation.

of her detail in the summer of 1997, Hansen attempted to resolve her issues by "exploring means of extending her appointment."  Def.'s Reply, Ex. 19 (Hansen Decl.) ¶ 5.  However, from what Hansen could recollect from his understanding, this attempt at resolving Plaintiff's complaint failed because "Dr. Maramark had served the terms allowed by the applicable statute, and further extension would have been in direct violation of that statute."  *Id.*

Third, the only apparent way that excepted service employees could obtain a career position with the Department of Education was through an application to position vacancies announced to "all sources" – i.e., open to outside hires.  *See* Def.'s Mot. for Summ. J., Ex. 9 (2/24/05 Hansen Dep.) at 33:12-21; *see also id.*., Ex. 5 (8/9/94 e-mail from Robert Morgan to Jacquelyn Zimmerman) (the union had no objection to excepted service employees competing for and obtaining permanent, career positions by competition).  However, (1) Plaintiff did not apply for such an "all sources" position during the relevant time period, *see* Pl.'s Surreply at 1-2; Pl.'s Opp'n, Ex. 11 (10/11/01 E-mail from Thomas Johnston to Karen Mayo-Tall) (indicating that there is "no record of Sheilah Maramark [] having applied for vacancies or making the BQ certs"), and (2) there were no available vacancies or positions posted in the NLE during this time period, *see* Def.'s Mot. for Summ. J., Ex. 12 (12/9/04 Dessy Dep.) at 27:21-28:2, 40:12-16.  Outside of this avenue – i.e., the awarding of a career position to an excepted service term employee through an open, all sources, competitive process – excepted term employees could not gain permanent employment at the Department of Education, and Hansen would not have acquiesced to a promise to create or tailor a position for a particular employee outside of this process.  Def.'s Mot. for Summ. J., Ex. 9 (2/24/05 Hansen Dep.) at 103:10-16.

18

b.      *Plaintiff's Argument that It Was Possible For an Excepted Service*
        *Term Employee to Become a Permanent Employee*

Plaintiff counters that it was possible within the Department of Education for an excepted

service term employee to be "rolled over" into a permanent employee.  Plaintiff relies on two

principal arguments to support this claim.

First, Plaintiff contends that a directive regarding excepted appointing authority/non-

bargaining unit employees between the Department of Education and the American Federation of

Government Employees issued on February 23, 1986 – *after* the June 17, 1982 directive that

contained language limiting the length that excepted service term employees could stay at the

Department of Education – contains a provision that contemplates "indefinite" appointments for

excepted service term employees.  *See* Pl.'s Opp'n, Ex. 8 (Feb. 23, 1986 Directive re: Excepted

Appointing Authority/Non-Bargaining Unit Employees).  In relevant part, the February 23, 1986

directive states:

> Section 405(e)(5) of the General Education Provisions Act (GEPA), as amended,
> P.L. 92-318, 20 U.S. Code 1221e(e)(5) authorizes two types of appointments for
> professional or technical employees:  term appointments not to exceed three years
> and indefinite appointments.
>
> *      *      *      *      *      *      *      *      *      *      *
>
> Indefinite–In rare circumstances, when the OERI has a continuing need for a
> particular expertise and when there is an excepted appointee who has clearly
> demonstrated this kind of expertise in an exemplary fashion, the Assistant Secretary
> <u>may</u> make an indefinite appointment.  To be eligible for consideration for an
> indefinite appointment, an excepted appointee is required to have at least 6 years of
> service in OERI that are characterized by sustained excellent performance and
> outstanding contributions to the accomplishment of OERI's mission.  The
> candidate's performance and the needs of OERI are major determining factors in
> decisions concerning the granting of indefinite appointments.

*Id.* at OERI:11-9, OERI:11-15.

19

Second, Plaintiff alleges that certain excepted service term employees actually were "converted" to permanent, career employees in the Department of Education's OERI.  While Plaintiff is quite unclear when it comes to actually identifying excepted service term employees who were "converted" to permanent status, *see* Pl.'s Opp'n at 37-39 (making a variety of claims regarding the number of converted employees but providing little detail), as can best be ascertained, Plaintiff alleges that these excepted service term employees were "converted" into permanent employees (all Caucasian):  (1) Harold Himmelfarb, (2) Carole Lacampagne, (3) David Boesel, and (4) Eve Bither.  *See, e.g.*, Pl.'s Opp'n at 38-39.  Plaintiff also contends that, through an analysis of the attached exhibits (some of which have been filed under seal), it is evident that even more excepted service term employees were "converted" to permanent employment.

Plaintiff's second argument has numerous factual problems.  First, the record is quite clear that Himmelfarb and Lacampagne were actually selected to become career employees of the Department of Education through a competitive selection process, not a detail somehow "rolled over" into a career appointment (the method sought by Plaintiff).  *See, e.g.*, Def.'s Mot. for Summ. J., Ex. 18 (Second Young Decl.) ¶¶ 3-4 & Exs. B & C; Def.'s Mot. for Summ. J., Ex. 10 (8/27/98 Hansen Test. in *Maramark v. Riley*, Compl. No. ED-9747000) at 65:5-14, 70:14-16; *id.*, Ex. 10 (8/27/98 Lacampagne Test. in *Maramark v. Riley*, Compl. No. ED-9747000) at 5:10-14, 12:7-15, 25:5-16; Def.'s Reply, Ex. 19 (Hansen Decl.) ¶ 6; Pl.'s Opp'n, Ex. 2 (2/24/05 Hansen Dep.) at 32:13-21 (noting that the position eventually obtained by Lacampagne was "posted all sources").[7]

---

[7] Plaintiff makes some kind of diffuse complaint that the OERI received a "special dispensation" for Lacampagne and implies that this means that Lacampagne was somehow illicitly "rolled over" from an excepted service position into a career position.  *See* Pl.'s Opp'n at 10 (citing Pl.'s Opp'n, Ex. 2 (2/24/05 Hansen Dep.) at 32).  Plaintiff's argument misrepresents the record and Hansen's testimony.  Rather, Hansen testified that the department had to get a "special dispensation" to post the open position, because the department during this time period (early 1996) had reached

Second, there is no indication in the record whatsoever that David Boesel – who was later detailed to the NLE – was a term limited employee whose appointment was extended contrary to statute.  *See, e.g.*, Pl.'s Opp'n, Ex. 6 (Unredacted Disposition of Excepted Service Employees from 1993-1997) (filed under seal); *id.*, Ex. 7 (Resp. to Pl.'s Interrogs.); *id.*, Ex. 28 (Unredacted List of OERI Excepted Service Employees) (filed under seal).  While it is true that Boesel was eventually detailed to the NLE after Plaintiff left the OERI, there is no indication in the record that he was not a permanent employee of the Department of Education when this happened, and Boesel's name does not appear on any of the lists of "excepted service term employees" adduced during discovery.  *See id.*  Accordingly, Plaintiff simply has no evidence that Boesel (1) was ever an excepted service term employee like herself, or (2) that if he was, he was somehow "rolled over" into a permanent position without being selected to an "all source" vacancy via a competitive process.

Third, the Court's previous ruling on 17, 2004 barred a further consideration of Plaintiff's allegation that Ms. Eve Bither was permitted to maintain her appointment beyond the maximum six-year period, and then "rolled over" into a career service position.  *See Maramark v. Paige*, Civ. No. 01-2206, at 11 n.11 (D.D.C. Feb. 17, 2004) (memorandum opinion and order dismissing all claims other than Plaintiff's allegations surrounding the denial of a detail to the NLE) (quoting Pl.'s Opp'n to Def.'s Mot. to Dismiss at 24).  Despite this ruling, Plaintiff's Opposition remained focused on Ms. Bither, *see* Pl.'s Opp'n at 27 & n.16, and Plaintiff submitted notifications of personnel action for Ms. Bither as part of her exhibits, *see id.*, Ex. 27 (Notifications of Personnel Action re: Eve Bither).  A review of these materials and the testimony of Charles Hansen reveals that Plaintiff's assertion

---

its budgetary ceiling.  *See* Pl.'s Opp'n, Ex. 2 (2/24/05 Hansen Dep.) at 30:12-33:7.  The dispensation allowed the OERI to breach the ceiling, post the position, interview "all source" applicants, and fill the position – which Lacampagne obtained through competition.

that Eve Bither, as an excepted service term employee, was somehow provided a *third* service term

is erroneous.  Rather, it is clear that Ms. Bither, as an excepted service term employee pursuant to

Pub. L. No. 103-227, § 912(c), began her first three-year term with the Department of Education on

June 15, 1992, and was reappointed for a second three-year term on June 15, 1995.  *See id.*, Ex. 27

(Notifications of Personnel Action re: Eve Bither).  However, near the end of her second term, when

she normally would have been required to leave the Department of Education, Bither was taken out

of the excepted service term category and given a political appointment by a different body pursuant

to an entirely different authority – Pub. L. No. 103-227, § 921(e)(1) – to the position of Executive

Director of the OERI Board.  *See id.*, Ex. 27 (Notifications of Personnel Action re: Eve Bither);

Pub. L. No. 103-227, § 921(e)(1) ("In carrying out its functions, powers, and responsibilities, the

Board shall, without regard to the provisions of title 5, United States Code, relating to the

appointment and compensation of officers or employees of the United States, appoint a director at a

rate of basic pay payable for level V of the Executive Schedule who shall assist in carrying out and

managing the activities of the Board and perform such other functions the Board determines to be

necessary and appropriate . . . .").  As a political appointment, the Executive Director position was

not a permanent position, and could – and did – change with administrations.  During the deposition

process, Hansen explained this procedure to Plaintff, noting "[i]t was a – it was a different authority.

That board had its own authority, and the executive director of the board was specific in that

authority, so it was an entirely different authority.  It wasn't accepted service in the sense of the rest

of OERI . . . . There are two separate legislative authorities.  Although the board was associated with

OERI, it had its own legislation . . . . Somebody could spend six years in an accepted [sic] service

[position] and take a political Schedule C appointment."  Pl.'s Opp'n, Ex. 2 (2/24/05 Hansen Dep.)

at 26:1-28:8, 119:1-121:2.

22

Fourth, and perhaps most importantly, a review of all OERI Associates – i.e, excepted service term employees – who did garner permanent positions with the agency shows that these employees gained a permanent position only after being selected from a competitive job announcement. *See* Pl.'s Opp'n, Ex. 6 (Unredacted Disposition of Excepted Service Employees from 1993-1997) (filed under seal); *id.*, Ex. 7 (Resp. to Pl.'s Interrogs.).  While Plaintiff claims that numerous excepted term employees were "converted" to permanent status, *see* Pl.'s Opp'n at 37-39, she never differentiates between those that were "converted" as a result of being selected through a competitive job announcement and those that were somehow "rolled over" into permanent status.  In fact, no evidence indicates that any excepted service term employees were "rolled over" into permanent status – the "special dispensation" avenue towards career employment focused on by Plaintiff in her arguments.

## II: LEGAL STANDARDS

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  Under the summary judgment standard, Defendant, as the moving party, bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Plaintiff, in response to Defendants' motion, must "go beyond the pleadings and by [his] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal citations omitted).

23

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251, 106 S.Ct. 2505 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50, 106 S.Ct. 2505 (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Id.* at 587, 106 S.Ct. 1348 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

Importantly, "[w]hile summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Morgan v.*

24

*Fed. Home Loan Mortgage Corp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001) (quoting *Calhoun v.*

*Johnson*, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998) (internal citation omitted),

*aff'd*, No. 99-5126, 1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 2000)); *see also Marshall v.*

*James*, 276 F. Supp. 2d 41, 47 (D.D.C. 2003) (special caution "does not eliminate the use of

summary judgment in discrimination cases") (citing cases).  "Summary judgment is not a

'disfavored procedural shortcut,' but is an integral procedural tool which promotes the speedy and

inexpensive resolution of every case." *Marshall*, 276 F. Supp. 2d at 47 (quoting *Celotex Corp.*,

477 U.S. at 327).  Accordingly, the Court reviews the defendant's motion for summary judgment

under a "heightened standard" that reflects "special caution."  *Aka v. Washington Hosp. Ctr.*, 116

F.3d 876, 879 (D.C. Cir. 1997) (internal quotations omitted), *overturned on other grounds*, 156

F.3d 1284 (D.C. Cir. 1998) (en banc).  Nonetheless, while this special standard is more exacting, it

is not inherently preclusive.  Although more circumspect, the Court will continue to grant a motion

for summary judgment in which the nonmoving party has failed to submit evidence that creates a

genuine factual dispute and the moving party is entitled to a judgment as a matter of law.

### III: DISCUSSION

The Court shall begin its analysis by first examining Plaintiff's Title VII discrimination

claim arising out of the denial of her requested detail, and then shall turn to a consideration of

Plaintiff's Title VII retaliation claim arising out of the same events.

A.    *Plaintiff's Discrimination Claim*

1.    Title VII's Tripartite Burden-Shifting Framework

Plaintiff brings this action pursuant to Title VII, which states that all personnel actions

affecting employees "shall be made free from any discrimination based on race, color, religion, sex,

or national origin."  42 U.S.C. § 2000e-16(a).  It is uncontested that Plaintiff was an employee

25

during the relevant time period and the Department of Education is an employer within the meaning

of Title VII.  The Court exercises jurisdiction over Plaintiff's Title VII claim according to 28 U.S.C.

§ 1331.

To prove a Title VII violation, Plaintiff must demonstrate by a preponderance of the

evidence that the actions taken by the Agency were "more likely than not based on the consideration

of impermissible factors" such as race or gender.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S.

248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (internal quotation marks and citation omitted).

Where, as here, the record contains no direct evidence of discrimination, it is necessary to employ

the *McDonnell Douglas* tripartite burden-shifting framework.  *Cones v. Shalala*, 199 F.3d 512,

516 (D.C. Cir. 2000) (citing *McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36

L.Ed.2d  668 (1973)).  It is the district court's responsibility to closely adhere to this analysis and go

no further, as it does not sit as a "super-personnel department that reexamines an entity's business

decisions."  *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal

citation and quotation marks omitted).

Under the *McDonnell Douglas* paradigm, Plaintiff has the initial burden of proving by a

preponderance of the evidence a "*prima facie*" case of discrimination.  *McDonnell Douglas*, 411

U.S. at 802, 93 S.Ct. 1817.  If he succeeds, the burden shifts to the Agency to articulate some

legitimate, non-discriminatory reason for Plaintiff's non-selection or termination, and to produce

credible evidence supporting its claim.  *Id.*  The Agency's burden is only one of production, and it

"need not persuade the court that it was actually motivated by the proffered reasons."  *Burdine*, 450

U.S. at 254, 101 S.Ct. 1089; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113

S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("[T]he determination that a defendant has met its burden of

production (and has thus rebutted any legal presumption of intentional discrimination) can involve

no credibility assessment.").  As such, "the *McDonnell Douglas* framework shifts intermediate

evidentiary burdens between the parties, [t]he ultimate burden of persuading the trier of fact that the

defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."

*Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003), *cert. denied*,

540 U.S. 881, 124 S. Ct. 325, 157 L.Ed.2d 146 (2003); *see also Burdine*, 450 U.S. at 253, 101

S.Ct. 1089.

If Defendant is successful, then "the *McDonnell Douglas* framework -- with its

presumptions and burdens -- disappear[s], and the sole remaining issue [is] discrimination *vel non*."

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43, 120 S.Ct. 2097, 147 L.Ed.2d

105 (2000) (internal citations and quotation marks omitted); *see also Burke v. Gold*, 286 F.3d 513,

520 (D.C. Cir. 2002) (once defendant offers a non-discriminatory explanation for its actions, the

presumption of discrimination "simply drops out of the picture") (quoting *St. Mary's Honor Ctr.*,

590 U.S. at 511, 113 S.Ct. 2742) .  At that point, Plaintiff has the burden of persuasion to show that

the Agency's proffered reason was not the true reason for the employment decision.  *Burdine*, 450

U.S. at 256, 101 S.Ct. 1089.  Pretext may be established "directly by persuading the court that a

discriminatory reason more likely motivated the employer or indirectly by showing that the

employer's proffered explanation is unworthy of credence."  *Id.* at 256, 101 S.Ct. 1089; *see also*

*Reeves*, 530 U.S. at 143, 120 S.Ct. 2097.  "Proof that the defendant's explanation is unworthy of

credence is simply one form of circumstantial evidence that is probative of intentional

discrimination, and it may be quite persuasive."  *Reeves*, 530 U.S. at 147, 120 S.Ct. 2097 (citing *St.*

*Mary's Honor Ctr.*, 590 U.S. at 517, 113 S.Ct. 2742) ("[P]roving the employer's reason false

becomes part of (and often considerably assists) the greater enterprise of proving that the real reason

27

was intentional discrimination."); *see also Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C. Cir. 1998) (en banc) ("[A] plaintiff's discrediting of an employer's stated reason for its employment decision is entitled to considerable weight.").  Notably, the Supreme Court has taken care to instruct trial courts that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148, 120 S.Ct. 2097.  "[T]he trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Id.* at 143, 120 S.Ct. 2097 (quoting *Burdine*, 450 U.S. at 255 n.10, 101 S.Ct. 1089).

Accordingly, "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003); *see also Aka*, 156 F.3d at 1290.  The D.C. Circuit recently defined "all of the evidence" as "any combination of (1) evidence establishing the plaintiff's prima facie case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer." *Holcomb v. Powell*, --- F.3d ----, 2006 WL 45853, at *5 (D.C Cir. Jan 10, 2006) (citing *Aka*, 156 F.3d at 1289).  "At this stage, if [plaintiff] is unable to adduce evidence that could allow a reasonable trier of fact to conclude that [defendant's] proffered reason was a pretext for discrimination, summary judgment must be entered against [plaintiff]." *Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 27-28 (D.C. Cir. 1997).  "[T]he court must consider all the evidence in its full context in deciding whether the plaintiff has met his burden of showing that a reasonable jury could conclude that he has suffered discrimination." *Aka*, 156 F.3d

at 1290.

2.        The Requirements Necessary to Establish Plaintiff's *Prima Facie* Case

To establish a *prima facie* case of disparate-treatment race-based discrimination under Title

VII, Plaintiff must show that:  (1) she is a member of a protected class; (2) she suffered an adverse

employment action; and (3) she was treated differently from similarly-situated employees outside the

protected class.  *See Mitchell v. Baldrige*, 759 F.2d 80, 84 (D.C. Cir. 1985); *Douglas v. Pierce*,

707 F. Supp. 567, 571 (D.D.C. 1988), *aff'd*, 906 F.2d 783 (1990); *cf. Stella v. Mineta*, 284 F.3d

135, 145 (D.C. Cir. 2002) (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)); *Charles*

*v. Nat'l Rehab. Hosp.*, Civ. No. 94-0171, 1994 WL 874211, at *5 (D.D.C. Sept. 29, 1994);

*Childers v. Slater*, 44 F. Supp. 2d 8, 18 (D.D.C. 2000), *vacated in part on other grounds*, 197

F.R.D. 185, 191 (D.D.C. 2000).  In this case, it is clear that Plaintiff has met the first prong of the

*prima facie* case – she is an African-American, and therefore a member of a protected class.

However, Plaintiff has significant problems vis-á-vis the second prong of the analysis – i.e, the

requirement that Plaintiff show that she suffered an adverse employment action resulting from the

denial of her requested detail to the NLE.

To establish an adverse employment action in the absence of a diminution in pay or benefits,

Plaintiff must show an action with "materially adverse consequences affecting the terms, conditions,

or privileges of employment."  *Brody*, 199 F.3d at 457.  The employment decision must inflict

"objectively tangible harm."  *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001) (recognizing

that this requirement "guards against both judicial micromanagement of business practices, and

frivolous suits over insignificant slights") (internal quotation omitted).  "An employment decision

does not rise to the level of an actionable adverse action . . . unless there is a tangible change in the

duties or working conditions constituting a material employment disadvantage." *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002); *see also Russell*, 257 F.3d at 818 ("[N]ot everything that makes an employee unhappy is an actionable adverse action. Minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would otherwise form the basis of a discrimination suit.") (citations and internal quotation omitted). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Importantly, a "lateral transfer or the denial thereof, *without more*, does not constitute an adverse employment action." *Stewart*, 275 F.3d at 1135 (emphasis added) (denial of an "acting" designation cannot be considered an adverse employment action because "this type of temporary designation is not one of the terms, conditions, or privileges of employment contemplated by Title VII"); *Brody*, 199 F.3d at 457 (denial of lateral transfer that did not affect pay or benefits insufficient to constitute adverse employment action); *Taylor*, 132 F.3d at 764 (denial of temporary designation as acting section head insufficient to constitute an adverse employment action); *Smith v. Dist. of Columbia*, 271 F. Supp. 2d 165, 172 (D.D.C. 2003) (temporary reassignment without diminution in pay and benefits is not an adverse employment action).

    In this case, given that it is undisputed that the detail requested by Plaintiff to NLE did not involve an alteration of Plaintiff's pay or benefits, the only way that Plaintiff can establish that the denial of the requested detail was an "adverse employment action" is by proving that either the detail itself or the skills acquired pursuant to that detail could have led to a promotion or permanent position within the Department of Education. Indeed, the Court relied on Plaintiff's representations that this was the case in denying Defendant's pre-discovery motion for summary judgment on her

detail claim, although the Court did leave open the possibility that the facts adduced during the

discovery process might not support Plaintiff's contention. *See Maramark v. Paige*, Civ. No. 01-

2206, at 8-9 (D.D.C. Feb. 17, 2004) (memorandum opinion and order dismissing all claims other

than Plaintiff's allegations surrounding the denial of a detail to the NLE) (quoting Pl.'s Opp'n, Ex. 1

(Pl.'s Decl.) ¶ 4, and drawing all factual inferences in favor of Plaintiff on a motion to dismiss/pre-

discovery motion for summary judgment).

In the post-discovery summary judgment context, a conclusory affidavit, supported by no

evidence within the record, is insufficient to avoid summary judgment. *See Johnson v. U.S. Capitol

Police Bd.*, Civ. No. 03-614 (HHK), 2005 WL 486743, at *2 (D.D.C. Mar. 2, 2005) (finding that

an affidavit submitted in opposition to a summary judgment motion did not meet the standard under

Rule 56 because it was "unsupported by any record evidence"); *Hastie v. Henderson*, 121 F. Supp.

2d 72, 81 (D.D.C. 2000), *aff'd sub. nom.*, *Hastie v. Potter*, Civ. No. 00-5423, 2001 WL 793715,

at *1 (D.C. Cir. June 28, 2001) (no genuine issue of material fact where sole evidence plaintiff

provided was "her own self-serving and conclusory statement"); *Phillips v. Holladay Prop. Serv.,

Inc.*, 937 F. Supp. 32, 35 n.2 (D.D.C. 1996), *aff'd*, 1997 WL 411695 (D.C. Cir. 1997) ("[A]

plaintiff's denial . . . without producing substantiation for the denial is insufficient to withstand a

motion for summary judgment."); *Matthews v. Hesburgh*, 504 F. Supp. 108, 114 n.16 (D.D.C.

1980) ("Mere allegations even in an affidavit, unsupported by specific facts, are insufficient to resist

a motion for summary judgment."), *aff'd*, 672 F.2d 895 (D.C. Cir. 1981).  Accordingly, the Court

must turn to an analysis of the record adduced during discovery to determine whether the denial of

Plaintiff's requested detail to the NLE in late 1996/1997 could have affected her chances of

promotion and/or permanent employment with the Department of Education.  If the denial of the

detail could have impacted her chances of promotion and/or permanent employment, then Plaintiff

has established an "adverse action."  If the denial of the detail to the NLE did not affect these

considerations, then Defendant's lack of action regarding Plaintiff's requested detail did not have

objective, tangible, and "materially adverse consequences [for] the terms, conditions, or privileges"

of Plaintiff's employment, *see, e.g.*, *Stewart v. Ashcroft*, 352 F.3d 422, 426-27 (D.C. Cir. 2003);

*Brody*, 199 F.3d at 457.  If this is the case, then Plaintiff cannot establish an "adverse action," and

her discrimination claim must be dismissed.

### 3.   Plaintiff Cannot Establish an "Adverse Action"

Upon a review of the record, it is plain that Plaintiff cannot meet the conditions necessary to

establish that she suffered an "adverse action" as a result of the denial of her requested detail to the

NLE.  Importantly, given that it is undisputed that Plaintiff did not "look elsewhere" or "actively

pursu[e] other opportunities at the U.S. Department of Education," Pl.'s Surreply at 1-3; Pl.'s

Opp'n, Ex. 11 (10/11/01 E-mail from Thomas Johnston to Karen Mayo-Tall) (indicating that there

is "no record of Sheilah Maramark [] having applied for vacancies or making the BQ certs"), the

only possible avenue that Plaintiff has to support her argument that the denial of a detail to the NLE,

near the end of her six-year term with the Department of Education, was an "adverse action" is

through a showing that this denial impacted her chances for a promotion and/or permanent

employment with the agency.  However, the record definitively shows that – absent an application to

a competitive, "all sources" position, a step that Plaintiff did not take – an excepted service term

employee such as Plaintiff could not extend their term with the Department of Education.  Plaintiff's

claimed harm is the lost opportunity, in her opinion, to prepare for an illusory position that was

neither identified or assured.  Simply, the "avenue" focused on by Plaintiff, which involved her

being detailed to the NLE and then somehow being "rolled over" into a career position similar to the

detail that was specially designated for her, does not exist.

First, excepted service term employees faced statutory limitations on their amount of time

with the Department of Education, and – during the relevant time period – their employment could

not be extended "indefinitely" as Plaintiff suggests.  It is undisputed that Plaintiff falls into the

"excepted service term" category, as Plaintiff was hired pursuant to the statutes allowing the

Department of Education to "appoint, for terms not to exceed three years . . . such scientific or

professional employees" considered necessary to carry out the OERI's functions.  Def.'s Mot. for

Summ. J., Ex. 2 (Higher Education Amendments of 1986, Pub. L. No. 99-498, § 1401, 100 Stat.

1268 (1986); Goals 2000: Educate America Act, Pub. L. No. 103-227, § 912(c), 108 Stat. 124

(1994)).  The applicable statutory provisions allow the Department of Education to reappoint

limited term employees – such as Plaintiff – only "for one additional term not to exceed three years"

upon "presentation of a clear and convincing justification of need . . . ."  *See* Pub. L. No. 99-498, §

1401(d)(2)(A) ("The Secretary may appoint, for terms not to exceed three years (without regard to

the provisions of title 5, United States Code, governing appointment in the competitive service) . . .

such scientific or professional employees of the Office as the Secretary considers necessary to

accomplish its functions.") & (B) ("The Secretary may reappoint employees described in

subparagraph (A) upon presentation of a clear and convincing justification of need, for one

additional term not to exceed three years.  All such employees shall work on activities of the Office

and shall not be reassigned to other duties outside the Office during their term."); Pub. L. No. 103-

227, § 912(c)(2) (same).  The policy of senior management within the OERI and the agency's

Office of General Counsel was consistent with these statutory ceilings limiting the tenure of

excepted service term employees.  Def.'s Mot. for Summ. J., Ex. 9 (2/24/05 Hansen Dep.) at 33:12-

21; Def.'s Reply, Ex. 19 (Hansen Decl.) ¶ 4 ("During my employment with OERI, I was not aware

of any excepted service term employee receiving an extension of their limited appointment through

33

the means described by Dr. Maramark – i.e., detailed into a position to be later advertised and

targeted expressly for the detailee."); Pl.'s Opp'n, Ex. 11 (7/17/97 E-mail from Eugene Bell to

Hansen) (referencing "a copy of a January 10, 1995, memo from Office of General Counsel (OGC)

to Tom Hill that addresses the question of having excepted service employees serve more than two

terms" and noting that "OGC advises against allowing employees to serve more than two terms" as

"there is no suggestion in the legislative history that Congress intended 'to allow excepted service

scientific and technical employees in OERI to serve more than two terms'").

     Plaintiff attempts to escape these clear statutory limitations and customary employment

practices within the OERI by turning to the February 23, 1986 directive regarding excepted

appointing authority/non-bargaining employees between the Department of Education and the

American Federation of Government Employees.  *See* Pl.'s Opp'n, Ex. 8 (Feb. 23, 1986 Directive

re: Excepted Appointing Authority/Non-Bargaining Unit Employees).  While this directive does

seem to support Plaintiff's suggestion that, while rare, an indefinite appointment of a excepted

service term employee was possible, *id*. at OERI:11-15, the Court emphasizes that the directive

postulates that this ability comes from "Section 405(e)(5) of the General Education Provisions Act

(GEPA), as amended, P.L. 92-318, 20 U.S. Code 1221e(e)(5)," *id*. at OERI:11-9.  Unfortunately

for Plaintiff's argument, even assuming that this 1986 directive accurately stated the law at the time

of its issuance, the section cited – 20 U.S.C. § 1221e(e)(5) – was repealed on March 31, 1994 by

the "Goals 2000: Educate America Act," Pub. L. No. 103-227, § 912(c), 108 Stat. 124 (1994).

The "Goals 2000: Educate America Act," which was the controlling statute during the relevant time

period in this case, did not contain a provision authorizing the "indefinite" appointment of excepted

service term employees and was quite clear that – at most – such employees could serve a total of

two terms (six years) at the Department of Education.  Such a limitation was consistent with the two

34

considerations laid out in the 1982 directive between the Department of Education and the American Federation of Government Employees.  *See* Def.'s Mot. for Summ. J., Ex. 3 (June 17, 1982 Directive) at OERI:12-1.  First, the strict tenure limitation "is a means of staying in touch with the frontiers of private research," because (1) rapid turnover is necessary to the stimulation of new research, experimental ideas, and fresh direction, and (2) "[i]ndividual[s] who have made contributions within the NIE [National Institute of Education] should return to the private sector to implement them."  *Id*.  Second, the "NIE is designed to act only as an initiator of education research with permanent funding for worthy projects coming from other sources."  *Id*. at OERI:12-2. Accordingly, it is plain that the relevant statute did not allow the "indefinite" appointment sought by Plaintiff, and "there is no suggestion in the legislative history that Congress intended 'to allow excepted service scientific and technical employees in OERI to serve more than two terms.'"  Pl.'s Opp'n, Ex. 11 (7/17/97 E-mail from Eugene Bell to Hansen).  As such, the failure of Defendant to grant Plaintiff's detail in late 1996/1997 could not have been an adverse action because Plaintiff's employment with the agency was ending in August 1997 and Plaintiff – absent a competitive, "all sources" application, a step that she did not take – could not have extended her tenure with the Department of Education.  Simply, the refusal to detail Plaintiff had no impact on her chances of promotion or permanent employment.

Second, even assuming *arguendo* that Plaintiff somehow could have circumvented the clear tenure restrictions enacted by Congress and implemented by the OERI, Plaintiff could not have obtained a career position with the NLE following the detail for other reasons.  Importantly, during this time frame, there were no available vacancies or positions posted in the NLE.  *See* Def.'s Mot. for Summ. J., Ex. 12 (12/9/04 Dessy Dep.) at 27:21-28:2, 40:12-16.  As such, even had Plaintiff been detailed to the NLE, there was no position available at the NLE that would have provided

permanent employment to Plaintiff.  *See id.*, Ex. 11 (12/28/04 Maramark Dep.) at 61:6-20, 62:2-6

(Plaintiff admits that "the best [Dessy] was able to offer at that point in time" was a detail to the

NLE, and Dessy did not explain to Plaintiff that she could pursue a permanent position with the

NLE via a term appointment); *id.*, Ex. 15 (7/13/98 Resp. to Pl.'s Interrogs. by Dessy) at 1 ("At no

time was Complainant formally offered a position in the National Library nor was any guarantee

made that a position could be created for Complainant.").  Moreover, even if a position at the NLE

had existed, due to severe budget constraints, on July 17, 1995, the Department of Education

announced "a strict hiring freeze effective immediately." *Id.*, Ex. 16 (Hiring Freeze Announcement).

In the hiring freeze memorandum, Madeline Kunin, Deputy Secretary, issued two directives that

directly impacted individuals in Plaintiff's position:  (1) "employees with excepted service

appointments . . . may not be converted to permanent appointments," as these employees were to be

considered "temporary" and "external" "for the purposes of the hiring freeze"; and (2) "temporary

appointments may not be extended beyond the date the current appointment expires or September

30, 1995, whichever is later, and temporary employees may not be converted to permanent

appointments." *Id.* at 1; *see also id.*, Ex. 9 (2/24/05 Hansen Dep.) at 90:21-24 (noting that after

this, "the opportunities for hiring were very, very limited").  Accordingly, the record indicates that

this hiring freeze barred Plaintiff from having her excepted service term appointment converted to a

permanent position, and ensured that her appointment could not be extended past its August 26,

1997 expiration date.  While this announcement did leave open the possibility of "a limited number

of outside hires," Plaintiff never applied as an outside hire during this time frame and the

announcement itself noted that "requests for such actions should be prepared only in exceptional

circumstances and submitted to the Executive Management Committee who will review them on a

case-by-case basis." *Id.* at 2.

Third, despite her best efforts, Plaintiff has failed to establish that any OERI excepted service term employees were ever converted to career employees absent a successful application to a competitive, "all sources" position.  Of the individuals identified by Plaintiff, the record is quite clear that Himmelfarb and Lacampagne were actually selected to become career employees of the Department of Education through a competitive selection process, not a detail somehow "rolled over" into a career appointment (the method sought by Plaintiff).  *See, e.g.*, Def.'s Mot. for Summ. J., Ex. 18 (Second Young Decl.) ¶¶ 3-4 & Exs. B & C; Def.'s Mot. for Summ. J., Ex. 10 (8/27/98 Hansen Test. in *Maramark v. Riley*, Compl. No. ED-9747000) at 65:5-14, 70:14-16; *id.*, Ex. 10 (8/27/98 Lacampagne Test. in *Maramark v. Riley*, Compl. No. ED-9747000) at 5:10-14, 12:7-15, 25:5-16; Def.'s Reply, Ex. 19 (Hansen Decl.) ¶ 6; Pl.'s Opp'n, Ex. 2 (2/24/05 Hansen Dep.) at 32:13-21 (noting that the position eventually obtained by Lacampagne was "posted all sources")..

Moreover, there is no indication in the record whatsoever that David Boesel – who was later detailed to the NLE – was a term limited employee whose appointment was extended contrary to statute.  *See, e.g.*, Pl.'s Opp'n, Ex. 6 (Unredacted Disposition of Excepted Service Employees from 1993-1997) (filed under seal); *id.*, Ex. 7 (Resp. to Pl.'s Interrogs.); *id.*, Ex. 28 (Unredacted List of OERI Excepted Service Employees) (filed under seal).  While it is true that Boesel was eventually detailed to the NLE after Plaintiff left the OERI, there is no indication in the record that he was not a permanent employee of the Department of Education when this happened, and Boesel's name does not appear on any of the lists of "excepted service term employees" adduced during discovery.  *See id*.  Accordingly, Plaintiff simply has no evidence that Boesel (1) was ever an excepted service term employee like herself, or (2) that if he was, he was somehow "rolled over" into a permanent position without being selected to an "all source" vacancy via a competitive process.

Additionally, the Court's previous ruling on February 17, 2004 barred a further consideration of Plaintiff's allegation that Ms. Eve Bither was permitted to maintain her appointment beyond the maximum six-year period, and then "rolled over" into a career service position. *See Maramark v. Paige*, Civ. No. 01-2206, at 11 n.11 (D.D.C. Feb. 17, 2004) (memorandum opinion and order dismissing all claims other than Plaintiff's allegations surrounding the denial of a detail to the NLE) (quoting Pl.'s Opp'n to Def.'s Mot. to Dismiss at 24).   Despite this ruling, Plaintiff's Opposition remained focused on Ms. Bither, *see* Pl.'s Opp'n at 27 & n.16, and Plaintiff submitted notifications of personnel action for Ms. Bither as part of her exhibits, *see id.*, Ex. 27 (Notifications of Personnel Action re: Eve Bither).   Even taking Plaintiff's gambit and reconsidering this issue, a review of these materials and the testimony of Charles Hansen reveals that Plaintiff's assertion that Eve Bither, as an excepted service term employee, was somehow provided a *third* service term is erroneous.   Rather, it is clear that Ms. Bither, as an excepted service term employee pursuant to Pub. L. No. 103-227, § 912(c), began her first three-year term with the Department of Education on June 15, 1992, and was reappointed for a second three-year term on June 15, 1995.   *See id.*, Ex. 27 (Notifications of Personnel Action re: Eve Bither).   However, near the end of her second term, when she normally would have been required to leave the Department of Education, Bither was taken out of the excepted service term category and given a political appointment by a different body pursuant to an entirely different authority – Pub. L. No. 103-227, § 921(e)(1) – to the position of Executive Director of the OERI Board.   *See id.*, Ex. 27 (Notifications of Personnel Action re: Eve Bither); Pub. L. No. 103-227, § 921(e)(1) ("In carrying out its functions, powers, and responsibilities, the Board shall, without regard to the provisions of title 5, United States Code, relating to the appointment and compensation of officers or employees of the United States, appoint a director at a rate of basic pay payable for level V of the Executive Schedule

38

who shall assist in carrying out and managing the activities of the Board and perform such other functions the Board determines to be necessary and appropriate . . . .").  As a political appointment, the Executive Director position was not a permanent position, and could – and did – change with administrations.  During the deposition process, Hansen explained this procedure to Plaintff, noting "[i]t was a – it was a different authority.  That board had its own authority, and the executive director of the board was specific in that authority, so it was an entirely different authority.  It wasn't accepted service in the sense of the rest of OERI . . . . There are two separate legislative authorities.  Although the board was associated with OERI, it had its own legislation . . . . Somebody could spend six years in an accepted [sic] service [position] and take a political Schedule C appointment."  Pl.'s Opp'n, Ex. 2 (2/24/05 Hansen Dep.) at 26:1-28:8, 119:1-121:2.  Accordingly, Plaintiff's assertion that Ms. Bither was "rolled over" into another term as an excepted service term employee contrary to statute and the announced practices of the OERI is inaccurate and without support in the record.  Rather, Ms. Bither was provided a political appointment to her Executive Director position pursuant to a different authority and a different statutory provision than the one governing Plaintiff's employment.  Simply, Plaintiff and Ms. Bither were not in comparable situations.

Finally, and perhaps most importantly, a review of all OERI Associates – i.e, excepted service term employees – who did garner permanent positions with the agency shows that these employees gained a permanent position only after being selected from a competitive job announcement.  *See* Pl.'s Opp'n, Ex. 6 (Unredacted Disposition of Excepted Service Employees from 1993-1997) (filed under seal); *id.*, Ex. 7 (Resp. to Pl.'s Interrogs.).  While Plaintiff claims that numerous excepted term employees were "converted" to permanent status, *see* Pl.'s Opp'n at 37-39, she never differentiates between those that were "converted" as a result of being selected through a competitive job announcement and those that she alleges were somehow "rolled over" into

39

permanent status.  In fact, a review of the exhibits cited by Plaintiff reveals no evidence indicating

that any excepted service term employees were "rolled over" into permanent status.

Ultimately, the denial of Plaintiff's requested detail did not have an impact on her career

with the Department of Education.  As an excepted service term employee, her time at the agency

was strictly limited by statute.  The OERI strictly followed these statutory guidelines, and only

"converted" excepted service term employees into career employees if those individuals successfully

navigated the competitive, "all sources" application process for an open position or vacancy.

Plaintiff never took this step during the relevant time period, as she hoped instead that – contrary to

statute and the customary practices of the agency – she could be given a detail that was then

transformed into a permanent position.  Notwithstanding these roadblocks, there were no available

permanent positions within the NLE – Plaintiff's sought after assignment – during this time, and a

strict hiring freeze applicable to Plaintiff also curtailed her opportunities.  Given these facts, the

denial of the detail simply did not "constitute a significant change" in Plaintiff's employment status,

did not inflict "objectively tangible harm," and did not produce "materially adverse consequences

affecting the terms, conditions, or privileges" of Plaintiff's employment with the Department of

Education.  *See Burlington Indus.*, 524 U.S. at 761, 118 S.Ct. 2257; *Russell*, 257 F.3d at 818;

*Brody*, 199 F.3d at 457.  Accordingly, Plaintiff cannot show that she suffered an "adverse action"

and cannot meet the standards necessary to establish a *prima facie* case of discrimination.

Defendant's motion for summary judgment as to this claim must therefore be granted.

B.      *Plaintiff's Retaliation Claim*

In addition to claiming that her supervisors at the OERI failed to act upon and effectuate her

requested detail to the NLE in late 1996/1997 as a result of discrimination, Plaintiff also contends

that illegitimate retaliatory motives colored this inaction by the Department of Education in

violation of the strictures of Title VII.  *See* Compl. ¶¶ 37-38 (Count II – Retaliation).  Specifically, Plaintiff contends that Charles Hansen, the Deputy Assistant Secretary given responsibility for the day-to-day operation of the OERI, and Blane Dessy, Director of the NLE, learned of her first EEO complaint (settled via a Memorandum of Agreement dated September 20, 1995) and denied her requested detail from the OERI to the NLE as a result of retaliatory animus flowing from that first EEO complaint.  *See, e.g.*, Pl.'s Disputed Mat. Facts ¶¶ 1-3, 14.

Title VII not only prohibits federal agencies from discriminating on the basis of race and gender, 42 U.S.C. § 2000e-16, it also prohibits them from retaliating against employees for the assertion of their rights under Title VII.  *See Forman v. Small*, 271 F.3d 285, 297 (D.C. Cir. 2001), *cert. denied*, 536 U.S. 958, 122 S.Ct. 2661, 153 L.Ed.2d 836 (2002).  To establish a *prima facie* case of retaliation, Plaintiff must show that: (1) she engaged in a statutorily protected activity; (2) the employer took an adverse personnel action; and (3) a causal connection exists between the protected activity and the adverse action.  *See Morgan*, 328 F.3d at 651; *Holbrook v. Reno*, 196 F.3d 255, 263 (D.C. Cir. 1999).

Upon an analysis, the Court concludes that Plaintiff is unable to establish a prima facie case of retaliation, and her claim must therefore be dismissed.  The fact that, as discussed previously, *see supra* Section III(A), Plaintiff cannot establish an "adverse action" is sufficient to defeat Plaintiff's retaliation claim.  However, the Court also notes for the fullness of the record that Plaintiff's retaliation claim would also fail because Plaintiff cannot establish the third element of a *prima facie* claim of retaliation – the requirement that Plaintiff prove that a causal connection exists between her protected activity (her first EEO complaint) and the denial of her detail.  Two considerations support this finding.

41

First, the considerable time lapse involved here is simply insufficient as a matter of law to establish a causal connection between Plaintiff's protected activity during her first EEO complaint – which ended with a Memorandum of Agreement signed on September 20, 1995, *see* Def.'s Mot. for Summ. J., Ex. 8 (Sept. 20, 2005 Memorandum of Agreement) – and the denial of her detail to the NLE in late 1996/1997.  To prove the required third element, i.e., a causal connection, Plaintiff must make a "showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity."  *Mitchell*, 759 F.2d at 86; *see also Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir. 1980) ("[C]ourts have recognized that proof of causal connection can be established indirectly by showing that discriminatory activity is followed by discriminatory treatment.").

Importantly, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima face case uniformly hold that the temporal proximity must be 'very close.'"  *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) ("Action taken (as here) 20 months later suggests, by itself, no causality at all.").  Courts have generally accepted time periods of a few days up to a few months, and have seldom accepted time lapses outside of a year in length.  *See Brodetski*, 141 F. Supp. 2d at 43.  The District Court for the District of Columbia has held that a matter of weeks, and of three to five months is a short enough time lapse between the protected activity and the alleged retaliatory conduct to establish a causal connection.  *See, e.g., Goos v. Nat'l Ass'n of Realtors*, 715 F. Supp. 2, 3-4 (D.D.C. 1989) (holding that five weeks constituted a short enough time lapse to establish a causal connection); *Castle v. Bentsen*, 867 F. Supp. 1, 3 (D.D.C. 1994) (holding that three to five months is a short enough time lapse between EEO activity and reprisal to establish a causal connection), *aff'd*, 78

42

F.3d 654 (D.C. Cir. 1996).

However, courts within this Circuit have also found that time lapses of greater length negate any inference that a causal connection exists between the protected activity and the complained-of action.  *See, e.g.*, *MECO Corp. v. Nat'l Labor Relations Bd.*, 986 F.2d 1434, 1437 (D.C. Cir. 1993) (citing various cases noting that gaps of four-to-eight months were insufficient to support an inference of causation in a similar setting); *Devera v. Adams*, 874 F. Supp. 17, 21 (D.D.C. 1995) (holding that "an eight month interval between the two events is not strongly suggestive of a causal link"), *aff'd*, 1997 WL 404898 (D.C. Cir. June 5, 1997); *Sullivan-Obst v. Powell*, 300 F. Supp. 2d 85, 92-93 (D.D.C. 2004) (lapses of over three months and over fifteen months were insufficient to support an inference of causation); *Garrett v. Lujan*, 799 F. Supp. 198, 202 (D.D.C. 1992) (holding that almost a year "between plaintiff's EEO activity and the adverse employment decision is too great [a length of time] to support an inference of reprisal"); *Townsend v. Washington Metro Airport Auth.*, 746 F. Supp. 178, 187 (D.D.C. 1990) (two year gap insufficient to create inference); *Forman*, 271 F.3d at 301 (three year lapse insufficient to support inference of causation).  Courts within other jurisdictions have held that similar lapses in time are not actionable.  *See, e.g.*, *Richmond v. Oneok, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (three month lapse, standing alone, is insufficient to establish causation); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (lapse of four months, by itself, is insufficient).  Accordingly, the greater the time that has elapsed between the protected activity and the alleged acts of discrimination, the more difficult it is for a complainant to justify an inference of causal connection between the two.  *See Saunders v. DiMario*, Civ. No. 97-1002, 1998 WL 525798, at *5 (D.D.C. Aug. 14, 1998).

Here, approximately one year passed between the resolution of Plaintiff's first EEO complaint on September 28, 1995 and her first notification to Hansen that – after she had completed all of her work for Dr. Robinson at the OERI – she was finally available to be detailed to the NLE as had been planned. Such a lapse in time ensures that, under District of Columbia precedent, Plaintiff is not able to establish the causation prong of her *prima facie* retaliation case simply by relying upon a showing of temporal proximity. Accordingly, Plaintiff must present evidence that would suggest to a reasonable fact-finder that there was some connection between her first EEO complaint and the Department of Education's later inaction in the face of her detail request.

Second, no reasonable fact-finder could conclude that the Department of Education retaliated against Plaintiff. Plaintiff simply points to no affirmative evidence in the record that would suggest that the two relevant officials – Hansen and Dessy – retaliated against her because of her first EEO complaint. First, the alleged discriminating officials named in Plaintiff's 1995 EEO complaint are different than those named in this suit. *See* Def.'s Mot. for Summ. J., Ex. 16 (8/27/98 Hansen Test. in *Maramark v. Riley*, Compl. No. ED-9747000) at 57:1-7. Moreover, the record indicates that Dessy was unaware of Plaintiff's 1995 EEO activity, and therefore there is no direct evidence that he retaliated against her. *See id.*., Ex. 10 (8/27/98 Dessy Test. in *Maramark v. Riley*, Compl. No. ED-9747000) at 78:3-6, 79:21-80:1; *see also id.*, Ex. 15 (7/13/98 Resp. to Pl.'s Interrogs. by Dessy) at 2 (noting that "I did not know the Complainant was involved in a previous EEO activity"). Plaintiff attempts to undermine Dessy's clear testimony that he had no knowledge of her previous EEO activity by (1) speculating that Dessy must have known of her previous activity because her 1995 Memorandum of Agreement was in the materials obtained by Inez Frazier, who worked in an administrative support position in Dessy's office, *see* Pl.'s Opp'n, Ex. 11 (4/26/96 E-mail from Inez Frazier to Delores Monroe re: "Detail of Employee"); *id.*, Ex. 14 (Pl.'s Decl.) ¶¶ 59-

44

60; and (2) positing that there was a perceptible change in the attitude of Dessy toward her after these materials were provided in April 1996, as their interactions went from cordial to "avoidant," *see id.*, Ex. 14 (Pl.'s Decl.) ¶¶ 39, 41-42.  However, Plaintiff's own speculation and conjecture, absent some affirmative evidentiary proof, is insufficient to defeat summary judgment.  *See, e.g.*, *Steinberg v. Dep't of Justice*, 179 F.R.D. 357, 360 (D.D.C. 1998); *Carter v. Peña*, 14 F. Supp. 2d 1, 7 (D.D.C. 1997) (use of conjecture is particularly inappropriate where plaintiff would bear the burden of proof at trial) (citing *Celotex Corp.*, 477 U.S. at 322-23, 106 S.Ct. 2548); *Campbell-El v. Dist. of Columbia*, 874 F. Supp. 403, 407 (D.D.C. 1994) ("Beliefs are not fact," and a plaintiff – to defeat a motion for summary judgment by a defendant – must provide facts); *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) ("[A] party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'") (citation omitted).  In this case, the only affirmative evidence in the record shows that Dessy had no knowledge of Plaintiff's previous EEO activity, and therefore could not have retaliated against her by denying her the planned detail.  Even assuming that a reasonable jury could rely on such speculation and find that Dessy had knowledge of Plaintiff's EEO complaint, Plaintiff would still be unable to show an adverse employment action, and her *prima facie* retaliation case would still fail.

In contrast to Dessy, Hansen clearly was aware of Plaintiff's 1995 EEO activity; however, the record fails to reflect a retaliatory animus on his part.  Importantly, Hansen participated in the resolution of Plaintiff's 1995 EEO complaint on behalf of the Department of Education and was the force behind the favorable resolution to Plaintiff.  *See* Def.'s Mot. for Summ. J., Ex. 9 (2/24/05 Hansen Dep.) at 13:8-11, 14:18-15:7.  Upon an investigation, Hansen concluded that there was insufficient evidence indicating a lack of performance by Plaintiff.  *Id*.  Accordingly, he supported

and effectuated a settlement with Plaintiff on September 20, 1995 that included: (1) a 10% pay

raise; (2) a title change to OERI Senior Research Associate (a position comparable to a GS-14 or

GS-15); (3) approximately nine months of back pay; (4) a reassignment of Plaintiff away from her

previous first and second-level supervisors; (5) a voiding of the negative performance appraisal; and

(6) attorney's fees. *Id.*; *see also* Def.'s Mot. for Summ. J., Ex. 8 (Sept. 20, 1995 Memorandum of

Agreement) at 1-3; *id.*, Ex. 10 (8/27/98 Hansen Test. in *Maramark v. Riley*, Compl. No. ED-

9747000) at 56:8-10. When Plaintiff requested a detail to the NLE in February 1996, it is

undisputed that Hansen supported the idea and Plaintiff's efforts, which were then delayed by her

remaining work at the OERI. *See* Def.'s Mot. for Summ. J., Ex. 13 (2/15/96 E-mail from Dessy to

Plaintiff and Humes) (Dessy states: "I have finally gotten a chance to speak with Chuck [Hansen]

about the details to the National Library. He said that if the current supervisor agrees, then it's

OK."). After Plaintiff brought an informal complaint regarding the denial of her detail in the

summer of 1997, Hansen once again attempted to resolve her issues in a manner favorable to

Plaintiff by "exploring means of extending her appointment." Def.'s Reply, Ex. 19 (Hansen Decl.) ¶

5. However, from what Hansen could recollect from his understanding, this attempt at resolving

Plaintiff's complaint failed because "Dr. Maramark had served the terms allowed by the applicable

statute, and further extension would have been in direct violation of that statute." *Id.*; *see also* Pl.'s

Opp'n, Ex. 11 (7/17/97 E-mail String, including e-mail from Eugene Bell to Hansen) (Hansen is

informed that "OGC advises against allowing employees to serve more than two terms" as "there is

no suggestion in the legislative history that Congress intended 'to allow excepted service scientific

and technical employees in OERI to serve more than two terms'"). As such, a review of the

evidence in the record indicates that Hansen was consistently positive towards Plaintiff, having

successfully negotiated a favorable settlement towards Plaintiff and then having attempted to broker

46

another such deal that would have extended Plaintiff's employment with the Department of

Education.  Plaintiff points to no evidence indicating that (1) Hansen made any comments to her

showing a retaliatory animus, or (2) Hansen made comments to others indicating any animus against

Plaintiff.  An investigation into Plaintiff's claim against Hansen reveals once more that her assertion

consists of little more than conjecture, supposition, and speculation – an insufficient basis to defeat a

motion for summary judgment.

     As such, the Court concludes that summary judgment in favor of Defendant on Plaintiff's

retaliation claim is warranted.  Importantly, Plaintiff simply did not suffer an adverse action through

the denial of her requested detail to the NLE.  Moreover, there is no evidence in the record that

would allow a reasonable fact-finder to conclude that the Department of Education retaliated against

Plaintiff as a result of her first EEO complaint in 1995.  Simply, Plaintiff lacks viable evidence that

would support a finding of a causal connection between her EEO activity and the later denial of the

detail, and the significant time lapse between the two events indicates that Plaintiff cannot establish a

causal connection simply through temporal proximity.  Accordingly, Plaintiff cannot establish two

out of the three elements necessary to prove a *prima facie* case of retaliation, and her summary

judgment claim must therefore be dismissed.

### IV: CONCLUSION

     For the reasons set forth above, the Court shall grant Defendant's Motion for Summary

Judgment.  An Order accompanies this Memorandum Opinion.


Date:   February 3, 2006


                               /s/
                         COLLEEN KOLLAR-KOTELLY
                         United States District Judge